IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTA BURKE, | ) |
|                 Plaintiff, | )  2:09-cv-01920-GEB-GGH |
| | ) |
|       v. | )  <u>ORDER GRANTING DEFENDANT</u> |
| | )  <u>STARBUCKS' MOTION FOR SUMMARY</u> |
| STARBUCKS COFFEE COMPANY, DOES | )  <u>JUDGMENT</u> |
| 1-10 | ) |
| | ) |
|               Defendants. | ) |
| _____ | ) |

Defendant Starbucks Coffee Company ("Starbucks") moves for summary judgment on all claims in Plaintiff Britta Burke's ("Burke") Complaint.

### I. Legal Standard

A party seeking summary judgment "initially bears the burden of proving the absence of a genuine issue of material fact." <u>In re Oracle Corp. Sec. Litig.</u>, --- F.3d ----, 2010 WL 4608794 at *5 (9th Cir. 2010). If this burden is satisfied, "the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." <u>Id.</u> "Where disputed issues of material fact exist, . . . [a]ll reasonable inferences must be drawn in favor of the non-moving party." <u>Bryan v. McPherson</u>, 608 F.3d 614, 619 (9th Cir. 2010) (citations omitted).

1  Further, under Local Rule 260: "Each motion for summary

2  judgment . . . shall be accompanied by a 'Statement of Undisputed Facts'

3  that . . . enumerate[s] discretely each of the specific material facts

4  relied upon in support of the motion." L.R. 260(a). This statement is

5  required to be supported by citations to "the particular portions of any

6  pleading, affidavit, deposition, interrogatory answer, admission, or

7  other document relied upon to establish that fact." Id.  Local Rule 260

8  also prescribes:

9         Any party opposing a motion for summary judgment or
   summary adjudication shall reproduce the itemized

10  facts in the Statement of Undisputed Facts and
    admit those facts that are undisputed and deny

11  those that are disputed, including with each denial
    a citation to the particular portions of any

12  pleading, affidavit, deposition, interrogatory
    answer, admission, or other document relied upon in

13  support of that denial. The opposing party may also
    file a concise 'Statement of Disputed Facts,' and

14  the source thereof in the record, of all additional
    material facts as to which there is a genuine issue

15  precluding summary judgment or adjudication.

16  L.R. 260(b).

17  If the nonmovant does not "specifically . . . [controvert duly

18  supported] facts identified in the [movant's] statement of undisputed

19  facts," the nonmovant "is deemed to have admitted the validity of the

20  facts contained in the [movant's] statement." Beard v. Banks, 548 U.S.

21  521, 527 (2006)) (finding that a party opposing summary judgment who

22  "fail[s] [to] specifically challenge the facts identified in the [moving

23  party's] statement of undisputed facts . . . is deemed to have admitted

24  the validity of [those] facts . . . .").

25  **II. Uncontroverted Facts, Plaintiff's Claims, and Procedural History**

26  "Burke was involved in a [non employment-related] car accident

27  at around 12:30 a.m. on October 28, 2008." (Separate Statement of

28  Undisputed Facts in Supp. of Defendant Starbucks Corporation's Mot. for

Summ. J. or, in the Alternative, Partial Summ. J. ("Def.'s SUF") ¶ 14.)
At the time of the car accident, Burke was employed as a Barista at a
Starbucks location in Sacramento, California. Id. ¶ 3. Burke reported
for her scheduled shift at Starbucks on October 31, 2008. Id. ¶ 30.
During this shift, Burke informed a supervisor that "she was hit by a
drunk driver, totaled her car, had pain in her back and legs, and that
she was on the right medication and could go into work." Id. ¶ 27. Burke
also told her coworkers she might not be "as fast as them." (Dep. of
Britta Burke ("Burke Depo") 80:14-15.) Burke fully completed her shift
on October 31, 2008, and also fully completed her work shifts on
November 1, 2008, and November 2, 2008. Id. ¶ 30. The three work shifts
"total[ed] over 17 hours." Id.

        "Burke was scheduled to work from 2:45 p.m. until 10:15 p.m.
on November 3, 2008. She did not report to work on that day [;and, she]
did not inform Starbucks, prior to or during her shift, that she would
not be reporting to work." Id. ¶ 43. Two of Burke's supervisors called
Burke on November 3, 2008, "regarding her failure to show up for her
shift" and left messages asking Burke to return their calls. Id. ¶¶ 44-
45. "Burke never responded." Id. One of the supervisors also called
Burke on November 4, 2008, and left a message asking Burke "to call him
and let him know if she intended to report to her November 5, 7, 8, and
9 shifts." Id. ¶ 46. The supervisor "also stated that he would assign
these shifts to other [employees] and leave [Burke] off the schedule for
the coming week . . . if he did not hear from [Burke] on the same day."
Id. The supervisor "did not hear from Burke. Therefore, he found
coverage for Burke's November 5, 7, 8, and 9 shifts. He also did not
assign Burke to any shifts for the week starting November 10, 2008

. . . . Burke did not report to work on November 5, 7, 8, or 9, 2008." Id. Burke was terminated on November 11, 2008 "for violating Starbucks Attendance and Punctuality Policy and abandoning her job." Id. ¶ 47.

Burke alleges in her Complaint that Starbucks violated California's Fair Employment and Housing Act ("FEHA") by failing to engage her in an interactive process concerning injuries she received in the automobile accident; failing to provide her a reasonable accommodation concerning those injuries; discriminating against her because of a disability resulting from those injuries; and retaliating against her because of her requests to engage in an interactive process and because she requested a reasonable accommodation. Burke also alleges a Whistleblower Retaliation claim under California Labor Code section 1102.5(b), and a claim for intentional infliction of emotional distress.

Burke also alleged a FEHA medical condition discrimination claim, which she abandoned in her opposition brief to Starbucks' summary judgment motion; therefore, this claim is dismissed.

### III. Discussion

**A.   FEHA Claims**

Starbucks argues it is entitled to summary judgment on Burke's FEHA claims since each claim is premised on Starbucks' knowing that Burke had a disability, and the uncontroverted facts show that Starbucks did not know Burke had a disability.

FEHA proscribes "an employer's intentionally discriminatory act against an employee because of . . . [the employee's] disability . . . ." Scotch v. Art Inst. of California-Orange Cnty., Inc., 173 Cal. App. 4th 986, 1002 (2009). "An employee cannot demand clairvoyance of [her] employer." King v. United Parcel Serv., Inc., 152 Cal. App. 4th 426, 443, (2007). "It is an employee's responsibility to understand his

or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee." Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 266 (2000). "While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under [FEHA]." Brundage v. Hahn, 57 Cal. App. 4th 228, 237 (1997) (citation and quotations omitted).

Starbucks presents the following statement of undisputed facts in support of its position that Burke did not have a known disability: Burke stated she had pain in her back and legs but could work if she was on the right medication, and Burke worked three consecutive shifts in full after the accident. (Def.'s SUF ¶¶ 27, 30.) Starbucks argues there is no evidence that Burke provided further details of her injuries, or told her supervisors that her injuries prevented her from performing employment duties.

Burke argues she made it "abundantly clear to [a supervisor] that she was injured from a head-on auto collision, that she was experiencing pain in her neck, back, legs, and dizziness and light-headedness, that she would need to be 'moving more slowly' at work and that she would be unable to engage in more strenuous activities such as move [sic] tables, chairs, and umbrellas." (Separate Statement in Opp. to Mot. for Summ. J./Adjudication ("Pl.'s SUF") ¶ 28.) Burke relies on the following portions of her deposition testimony as support for her arguments that she told a supervisor about her disability:

```
 1        Q.   What did you tell [your supervisor]?
          A.   The same thing about the car accident.
 2
          Q.   So you told him that your car was totaled?
 3        A.   Yes.

 4        Q.   You told him that you were hit by a drunk
               driver?
 5        A.   Yes.

 6        Q.   You told him that you had pain in your back
               and your legs?
 7        A.   Yes.

 8        Q.   That you were on the right medication and
               could still come into work?
 9        A.   Yes.

10        Q.   What else did you tell him?
          A.   I think that was it; that sums it up.
11
          Q.   What was [the supervisor's] response?
12        A.   The same as [another supervisor's], worried,
               concern, supportive, understanding.
13
                 .  .  .  .
14
          Q.   Did you personally tell each of [your
15             coworkers at Starbucks] that you were in a car
               accident?
16        A.   Yeah.

17        Q.   Did you -- what did you tell them?
          A.   Well, I explained I was in a car accident;
18             hence, you know, I'm working the best I can
               under these circumstances, letting my team
19             know what to expect.

20        Q.   What did you tell them what to expect? [sic]
          A.   That I was injured so if I wasn't as fast as
21             them to understand. Or manager or just -- for
               the same reason if someone is sick, you have
22             to let everyone know.

23        Q.   Did anybody complain about you not working --
               strike that. Did you think during those three
24             shifts that you were not working as fast as
               you normally worked?
25        A.   Did anyone complain or did I know?

26        Q.   Did you think that you were not working as
               fast as you normally were?
27        A.   Yes

28        Q.   How much slower were you?
```

```
 1        A.    Just a little bit slower. I mean, it's not --
                you  stand  in  front  of  --  you  know,  but
 2              standing for long periods of times gets tough
                when you're in an accident.
 3
          Q.    So what did you do?
 4        A.    So I -- I went through it. I worked through
                the pain.
 5
          Q.    Were there any tasks that you normally before
 6              the accident you could do [sic], but after the
                accident  you  could  not  do  while  you  were
 7              working  at  Starbucks  during  those  three
                shifts?
 8        A.    Yeah.
 9        Q.    What were they?
          A.    Like bringing in the furniture from outside,
10              the tables and chairs.
11        Q.    What else?
          A.    Umbrellas. Heavy Umbrellas. That was about it.
12              Anything heavy lifting or strenuous, they just
                wouldn't let me do it.
13
          Q.    Who wouldn't let you do?
14        A.    My co-workers.
15        Q.    Do you remember who wouldn't let you do those?
          A.    No, it would have just been anybody that I
16              worked with.
17
   (Burke Depo. 78:4-20, 80:6-81:23.)
18
19          This deposition testimony does not support Burke's arguments
20   that she told a supervisor she was unable to move certain furniture, or
21   had other work limitations.  Instead, this testimony supports Starbucks'
22   factual position that Burke only mentioned that she had pain in her back
23   and legs. Therefore, Burke has not presented evidence from which it
24   could reasonably be inferred that Starbucks knew or should have known
25   that Burke suffered from a physical and/or mental condition that made
26   work difficult for her.  See Arteaga, 163 Cal. App. 4th at 347 (finding
27   "a reasonable employer would conclude that [plaintiff's] pain was not
28   disabling" when plaintiff did not describe the "kind of pain" or "degree
     of pain" he experienced); Avila, 165 Cal. App. 4th at 1249 ("Informing
```

[the employer] merely that plaintiff had been hospitalized was not sufficient to put [the employer] on notice that plaintiff was suffering from a qualifying disability."). For the stated reasons, Starbucks' summary judgment motion on Burke's FEHA claims alleging that Starbucks failed to engage in an interactive process with her, failed to provide her with a reasonable accommodation, and subjected her to disability discrimination is granted.

Starbucks also argues it is entitled to summary judgment on Burke's FEHA unlawful retaliation claim. Burke alleges in her Complaint that Starbucks retaliated against her because of her following protected activity: "requesting a reasonable amount of time to recover from the injuries she sustained in the collision with the drunk driver;" attempting "to engage in the interactive process with Starbucks"; and, "ask[ing] [Starbucks] for a reasonable accommodation." (Pl.'s Compl. ¶ 32.) Burke also argued at the hearing on the motion that she suffered a retaliatory adverse employment action when Starbucks terminated her for working on a date she was not scheduled to work.

Starbucks argues it terminated Burke's employment based on a legitimate, nonretaliatory reason and cites the following statement of undisputed facts as support for its argument: Burke was scheduled to work on November 3, 2008, but did not report that day or inform Starbucks that she would not be reporting. (Def.'s SUF ¶ 43.) Burke's supervisors called her on November 3 and 4, 2008, and left messages regarding her failure to show up for her shift. Id. ¶¶ 44-46. When Burke's supervisor, Adrian Sanchez ("SM Sanchez"), called Burke and again left her a message on November 4, 2008,

> SM Sanchez stated that Burke had missed her shift the day before and [he] asked her to call him and let him know if she intended to report to her November 5, 7, 8, and 9 shifts. SM Sanchez also

1   stated that he would assign these shifts to other
    partners and leave her off the schedule for the
2   coming week (week of November 10) if he did not
    hear from her on the same day. SM Sanchez did not
3   hear from Burke. Therefore, he found coverage for
    Burke's November 5, 7, 8, and 9 shifts. Having not
4   heard back from Burke, SM Sanchez consulted with
    district manager Nancy Beal and submitted an
5   electronic partner action notice ("EPAN") to
    terminate Burke's employment for violating
6   Starbucks Attendance and Punctuality Policy and
    abandoning her job. SM Sanchez forward-dated
7   [Burke's] official termination date to November 11,
    2008 in Starbucks EPAN system to allow time for
8   Burke's final check to arrive at the store and for
    him to inform Burke of her termination.
9

10  Id. ¶¶ 46,47.

11       Burke counters these facts with her following statement of

12  undisputed facts: "[Burke] called the café and spoke with an employee,

13  who told her she was not scheduled to work on the 3rd. Instead, she was

14  written up for a 'no call/no show' for a purported shift on November

15  4th. However, Ms. Burke had called in and confirmed she was not

16  scheduled to work that day either." (Pl.'s SUF ¶ 43.) Further, Burke

17  states in her statement of undisputed facts: "No Starbucks management

18  personnel called Ms. Burke from November 3rd through November 11th and

19  leave any messages [sic] because if they had, Ms. Burke's parents would

20  have given her the messages." Id. ¶ 44. Burke argues her following

21  deposition testimony supports her factual assertions in her statement of

22  undisputed facts:

23       Q.   Do you remember if you were scheduled to work on the 4th?
         A:   That would have been the day that was a no call/no show.
24
         Q.   What do you mean?
25       A.   The 4th was the day that I called and they told me I did
              not work, which I obviously did work or apparently, and
26            they told me I didn't.

27       Q.   Did you work on the 4th?
         A.   No.
28
         . . . .

9

```
1    Q.   Did you check any time before the 3rd, for example, in
          November 3rd, whether or not you had to work on November
2         3rd?
     A.   Did I check with -- yes.
3
     Q.   When did you call?
4    A.   I don't remember.

5    Q.   Who did you talk to?
     A.   I don't remember.
6
     .  .  .  .
7
     Q.   How do you know [phone messages] would have been given to
8         you [by Burke's parents]?
     A.   Because they would have. They would have told me if
9         Starbucks called.
```

(Burke Depo. 89:16-25, 93:22-94:4, 126:10-13.)

Burke also testified during her deposition that "it is possible" her parents received voicemails and did not inform her, and also that she did not "know for sure" whether anyone from Starbucks called her on November 3 or 4, 2008, because she did not personally check to see if any voicemail messages were left. Id. 126:14-24.

Burke's deposition testimony does not support Burke's statements of undisputed facts, and fails to controvert Starbucks' facts showing that Burke failed to report to work as scheduled on November 3, 2008, and that Burke's supervisors called Burke and left messages concerning this failure. Therefore, Starbucks has shown it had a legitimate, nonretaliatory reason for terminating Burke, and Starbucks' motion for summary judgment is granted on Burke's FEHA retaliation claim. See Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005) ("If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to prove intentional retaliation.") (quotation omitted).

**B. Whistleblower Retaliation**

Starbucks also seeks summary judgment on Burke's Whistleblower Retaliation claim.  Burke alleges this claim under California Labor Code section 1102.5(b). This claim is based on Burke's allegation that she opposed Starbucks' action of taking her "off the schedule for the entire month . . . ." (Pl.'s Compl. ¶¶ 35, 36.) However, Starbucks has shown Burke was taken off the schedule because she failed to report to work when scheduled to work. Therefore, Starbucks' summary judgment motion on Burke's Whistleblower claim is granted.

**C. Intentional Infliction of Emotional Distress**

Starbucks also seeks summary judgment on Burke's intentional infliction of emotional distress ("IIED") claim. Burke alleges this claim is based on the allegations in her other claims on which Starbucks has been granted summary judgment. Since there is no evidence supporting the elements of an IIED claim, Starbucks' summary judgment motion on this claim is granted.

Burke also alleges a seventh claim for attorney's fees and costs. This claim is dismissed since it is dependent on Burke prevailing on claims on which summary judgment has been granted in favor of Starbucks.

**IV. Conclusion**

For the stated reasons, Starbucks' motion for summary judgment is granted. Judgment shall be entered in favor of Defendant.

Dated:  December 9, 2010

GARLAND E. BURRELL, JR.
United States District Judge